[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-14154

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 4, 2010
JOHN LEY
ACTING CLERK

D. C. Docket No. 06-00072-CR-01-JTC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EMMA GERALD,
DOUGLAS ROSS,
HUDSON ARAUJO,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(February 4, 2010)

Before TJOFLAT and BARKETT, Circuit Judges, and BARZILAY,* Judge.

---

* The Honorable Judith M. Barzilay, Judge, United States Court of International Trade, sitting by designation.

PER CURIAM:

Hudson Araujo, Douglas Ross, and Emma Gerald were convicted, after a jury trial, for their roles in a scheme in which they instructed immigrants, most of whom were illegally in the United States, how to prepare and file fraudulent applications with the United States Citizenship and Immigration Services of the Department of Homeland Security ("USCIS") for temporary residence, for temporary employment authorization, and also for travel authorization in the United States.[1]

The appellants all appeal their convictions, raising several different grounds. Ross and Araujo challenge the sufficiency of the evidence underlying their convictions. Ross and Gerald argue that the district court erred in giving the jury an instruction on deliberate indifference. Gerald additionally argues that (1) her due process rights were violated because the district court failed to adequately voir dire the jury about immigration matters, and (2) the district court improperly chastised defense counsel and criticized the defense case, thereby violating her right to counsel and due process. Finally, Gerald appeals her sentence on the

---

[1] Gerald was convicted of: (1) conspiracy to defraud the United States, under 18 U.S.C. § 371; (2) making false statements, under 18 U.S.C. § 1001; and (3) two counts of money laundering, under 18 U.S.C. § 1957.
Ross and Araujo were convicted of conspiracy to defraud the United States, under 18 U.S.C. § 371.

grounds that it was procedurally and substantively unreasonable.

## I. BACKGROUND

Emma Gerald operated a business known as "EJ Consulting Services" and held herself out as a consultant with immigration experience. At meetings around the country, Gerald instructed immigrants, many of whom were illegally in the United States, how to prepare and file fraudulent applications with USCIS for temporary residence, employment authorization, and travel authorization. Ross, who is Gerald's son, attended the meetings and acted as her assistant. Araujo, with Gerald's assistance, filed one fraudulent application with USCIS and thereafter assisted her with setting up and conducting meetings in Massachusetts, seeking more applicants.

The fraudulent applications were filed under a USCIS-administered program known as the CSS/Newman/LULAC amnesty program ("amnesty program"), which provided that immigrants who met certain basic admissibility requirements and had been illegally present in the United States prior to January 1, 1982 were entitled to apply for temporary resident status. The program also permitted those immigrants who met the stated criteria, but whose earlier applications were denied because they had traveled outside the United States during their illegal residence, to re-apply for temporary residence. In order to re-apply, the immigrant would fill

3

out a worksheet that established that he or she met the specific eligibility requirements. Once the immigrant applied for temporary residence, he or she also became eligible for employment authorization and travel authorization. Gerald charged the immigrants a non-refundable fee of $300 per person or $500 per married couple for assisting in the completion of the forms and filing the completed applications. Over time, this fee increased to $600 per person and $1100 per married couple.

Several of the meetings Gerald held were at the Bethel Christian Church in Marietta, Georgia. Kayttie Nogueira, who was then seventeen-years-old and a church member, served as Gerald's Portuguese translator for those meetings,[2] prepared a flyer at Gerald's request that advertised Gerald's services and contact information, and wrote residency letters after Gerald emailed to her a list of names.

At the first few meetings at Bethel Christian Church, the applicants signed blank applications for temporary residence. Those applications were later completed by Gerald and Ross outside of the presence of the applicant and mailed to USCIS without the applicant ever reviewing the eligibility and admissibility information. At subsequent meetings in Georgia, Florida, and Massachusetts, Gerald changed the method for completing applications. Applicants were given

---

[2] Gerald spoke English only and the majority of the attendees were Brazilians who spoke only Portuguese.

4

applications, and Gerald supplied them with the "correct" answers to the questions. Gerald did not read or explain any of the questions nor did she permit the applicants to leave with the applications after her presentation; instead, she mailed them to USCIS.

When applicants expressed their concern that they did not meet the requirements under the amnesty program to Gerald, she reassured them that their ineligibility was not a concern because the Government did not have any records establishing whether they had been illegally in the United States prior to 1982 nor whether they had previously applied for the amnesty program and been denied. The applicants signed form letters, which were then included with their applications, stating that they or their parents had been in the United States prior to 1982. On some occasions, Gerald and others prepared applications for people who had never been to the United States. Those applications were completed pursuant to Gerald's instructions and mailed to the applicants outside the United States for their signatures.

After a jury trial, Gerald, Ross, and Araujo were convicted of all the charges and timely filed their respective appeals.

## II. DISCUSSION

**A. Araujo's, Gerald's, and Ross's Convictions**

**1. Sufficiency of the Evidence Supporting Araujo's and Ross's Convictions**

Viewing the evidence in the light most favorable to the Government, see United States v. Cooper, 203 F.3d 1279, 1285 (11th Cir. 2000), we find no merit to the contention that there was insufficient evidence to support Araujo's and Ross's conspiracy convictions. The testimony established that Ross attended meetings with Gerald in Georgia, Florida, Massachusetts, and California, passed out applications and residency letters, collected money, completed applications signed by applicants, signed residency letters, and gave applicants receipts for their payments. Witnesses also testified that Araujo collected entrance fees, introduced Gerald at the beginning of the meetings, passed out applications and residency letters, and reviewed each applicant's completed application at the end of the meetings. In addition, Ross and Araujo were present at meetings in which Gerald informed the applicants that the Government lacked any records or ability to ascertain their ineligibility for the amnesty program and directed the applicants, using transparencies of the application pages on an overhead projector, how to complete the temporary residence applications with the "correct" (i.e. fraudulent) answers. In short, there was sufficient evidence to sustain Araujo and Ross's

6

conspiracy convictions.

## 2.     The District Court's Voir Dire About Immigration Matters

Gerald claims that the district court failed to adequately voir dire the jury about immigration matters.  Gerald's counsel proposed the following instruction: "Do you think there are any conditions under which illegal immigrants should be given amnesty and allowed to become legal residents?"  He then orally modified the proposed instruction: "Does anyone think it is appropriate for illegal immigrants to be given amnesty?" and "[Does anyone t]hink it is inappropriate?" The district court instead asked: "Do any of you feel so strongly about [the] issue [of amnesty] that if I give you your instructions on the law as to when amnesty is and when amnesty is not appropriate, you would not be able to follow my instructions?"  The record reflects that no defendant objected to the amnesty question posed by the district court, nor did any of the defendants request any further voir dire by the court.  Thus, our review is for plain error, and, under the circumstances in this case, we find none.  See United States v. Corey, 625 F.2d 704, 708 (5th Cir. 1980)[3] (holding that the district court did not err when it declined to use defendant's proposed questions and "adequately covered the

---

[3] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

essence of the proposed questions" through its own examination).

### 3. Limitation on Gerald's Direct Examination

Likewise, the record fails to support the claim that the district court improperly chastised defense counsel and criticized the defense case. Rather, the record reflects that the district court interrupted Gerald's testimony—after giving her considerable leeway—to limit it to matters relevant to the case. Similarly, the district court interrupted defense counsel's questioning about the amnesty forms to ensure that the questioning would focus on the "portions on the application which [were] in question in the suit." In addition, at the end of the trial, the district court instructed the jury that it was to ignore any comments that the court had made during the trial and reiterated that the jurors were the final arbiters of the facts. Given the district court's wide discretion in limiting repetitive or irrelevant testimony and its curative instructions, we cannot say that the district court abused its discretion in this case. See United States v. Day, 405 F.3d 1293, 1297 (11th Cir. 2005) (holding that district court enjoys broad latitude in managing a trial, including commenting on evidence, questioning witnesses, clarifying facts, and limiting counsel's examinations).

### 4. The Deliberate Ignorance Jury Instruction

Finally, Gerald and Ross argue that the district court erred in giving an instruction on deliberate ignorance (as proof of knowledge) when all of the evidence presented pointed to actual knowledge of the fraud. This Court has held that when evidence of actual knowledge is "so overwhelming as to compel a guilty verdict," the district court's error in giving a deliberate ignorance instruction is harmless. United States v. Rivera, 944 F.2d 1563, 1572-73 (11th Cir. 1991). Because the evidence of Gerald's and Ross's actual knowledge was overwhelming, as we have described herein, we find any error harmless.

### B. Procedural and Substantive Reasonableness of Gerald's Sentence

We review the sentence imposed by the district court for reasonableness. United States v. Talley, 431 F.3d 784, 785 (11th Cir. 2005) (citing United States v. Booker, 543 U.S. 220, 260-61 (2005)). After Booker, sentencing requires two steps. First, the district court must consult the United States Sentencing Guidelines and correctly calculate the range provided by the Guidelines. See United States v. Crawford, 407 F.3d 1174, 1178 (11th Cir. 2005) (citation omitted). Second, the

district court must consider the factors delineated in 18 U.S.C. § 3553(a).[4] Id.

### 1. Sentencing Guidelines Calculation

On appeal, Gerald argues that the district court's sentence was procedurally unreasonable because she should not have received an enhancement for involving a minor in her offense under Guideline § 3B1.4. Gerald contends that she did not recruit the then-seventeen-year-old Nogueira, that Nogueira was the one who invited her to the church, and that the fact that they were co-conspirators or confederates was insufficient to support the enhancement. Gerald adds that she never directed or asked Nogueira to interpret for her, as Nogueira did this as a part of her membership with the church, and that she did not ask Nogueira to write letters for immigrants, as the immigrants, not Gerald, requested this service.

We review the district court's interpretation of the Guidelines de novo, and we accept its factual findings unless clearly erroneous. United States v. Jordi, 418 F.3d 1212, 1214 (11th Cir. 2005). The district court must interpret the Guidelines and calculate the sentence correctly; an error in the district court's calculation of

---

[4] Several factors are considered when determining a reasonable sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims.

the advisory Guidelines range warrants vacating the sentence, unless the error is harmless. See United States v. Scott, 441 F.3d 1322, 1329-30 (11th Cir. 2006) (applying harmless error review to Guidelines miscalculation). The Government must establish the facts necessary to support a sentencing enhancement by a preponderance of the evidence. See United States v. Perez-Oliveros, 479 F.3d 779, 783 (11th Cir. 2007).

The relevant Sentencing Guideline provides for a two-level enhancement "[i]f the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense[.]" U.S.S.G. § 3B1.4. The application notes provide that "'[u]sed or attempted to use' includes directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting." Id. Cmt. 1. This Court has held that "a § 3B1.4 adjustment is warranted only where the defendant takes some affirmative step to involve a minor in the commission of the criminal activity." United States v. Taber, 497 F.3d 1177, 1181 (11th Cir. 2007), cert. denied, 128 S. Ct. 949 (2008). This Court has also noted that "[t]he unambiguous legislative design of section 3B1.4 is to protect minors as a class from being solicited, procured, recruited, counseled, encouraged, trained, directed, commanded, intimidated, or otherwise used to commit crime." United States v.

McClain, 252 F.3d 1279, 1286 (11th Cir. 2001) (internal quotation marks and citations omitted).

Here, there is no dispute that Nogueira was a minor during Gerald's commission of the offenses. The record clearly shows, based on Nogueira's own testimony, that, as required under § 3B1.4, Gerald took multiple affirmative acts to involve Noguiera in the crime, such that Noguiera's involvement was directly foreseeable to Gerald. See id. at 1288 (emphasizing foreseeability). Specifically, Gerald used and directed Nogueira to schedule the meetings at the church, pass out information to the applicants, translate for her during multiple meetings at Bethel Christian Church, complete falsified residency letters (including translated letters), and arrange meetings. Gerald also paid Noguiera $100 to create a flyer that promoted Gerald's "immigration consulting" services and provided Gerald's contact information. Nogueira helped Gerald in her scheme and was not merely present during the offense. Taber, 497 F.3d at 1181 (holding that defendant's affirmative acts of driving minor to robbery, helping minor enter the building, and serving as a look-out for the minor warranted sentencing enhancement). Certainly, Nogueira's actions furthered Gerald's scheme, but Gerald also actively encouraged Nogueira to commit a crime herself by preparing fraudulent letters for the purposes of obtaining an immigration benefit. U.S.S.G. § 3B1.4; 18 U.S.C. §§ 1001,

12

1546(a). The district court did not err by finding that Noguiera's role was an important one and applying the two-level enhancement.

### 2. Reasonableness of the Sentence Imposed

Next, Gerald argues that her 108-month sentence was substantively unreasonable under the § 3553(a) factors. She argues that her criminal conduct over a six-month period paled in comparison to the rest of her life, that her conduct did not harm the Government because the immigrants had already illegally entered by the time she counseled them and her actions did not change their illegal status, and that she actually brought a benefit to the Government by notifying it of each immigrant's presence in the country. Furthermore, Gerald argues that, based on her age and the non-violent nature of her crime, there was no reason to impose a 108-month sentence because she had a very low risk of recidivism, had learned the lessons of her actions, did not present a harm to the public, and had already suffered enough punishment. Gerald argues that a sentence of sixty months is appropriate based upon other cases involving similar conduct.

If the Guidelines calculation is correct or the miscalculation is harmless, we consider whether the sentence is reasonable. Talley, 431 F.3d at 786. When reviewing a sentence for reasonableness, we must evaluate the reasons given by the district court and whether the sentence achieves the purposes of sentencing

13

provided for in § 3553(a). Id. The party challenging the sentence bears the burden of establishing the sentence is unreasonable in light of the § 3553(a) factors. Id. at 788.

Here, the record demonstrates that the district court conducted a thorough and well-considered sentencing hearing. After hearing arguments from both parties on all the § 3553 factors, the district court granted some of the enhancements sought by the Government but it denied others. Moreover, the district court denied both the Government's (upward) and Gerald's (downward) motions for a variance sentence. Also, after weighing all the relevant factors, the district court concluded that a sentence within the Guidelines range was reasonable under § 3553(a).

We do not find Gerald's 108-month sentence substantively unreasonable. Specifically, the sentence reflects the seriousness of the offense given that her scheme involved a substantial number of fraudulent applications (over 1,000), covered many states, used a religious organization to launder money, and used a minor in the offense. Among other § 3553(a) factors, the district court's conclusion that Gerald showed a clear disregard for the law and the courts was supported by the extensive scale of the fraud on the Government. In light of the record, Gerald has not demonstrated that her within-Guidelines sentence is

substantively unreasonable.  <u>Talley</u>, 431 F.3d at 788.  The cases cited by Gerald in which a lower sentence was imposed are inapposite because those cases involved schemes much less extensive than Gerald's and, unlike Gerald, those defendants pled guilty and accepted responsibility.  Accordingly, the district court did not err in imposing the 108-month incarceration.

### III.  CONCLUSION

In sum, we conclude that there were no errors underlying the convictions of Araujo, Gerald, and Ross.  Additionally, we conclude that Gerald's sentence was procedurally and substantively reasonable.

**AFFIRMED.**